STATE OF NEBRASKA EX REL. PAUL L. DOUGLAS, ATTORNEY GENERAL, APPELLANT, V. ASSOCIATED GROCERS OF NEBRASKA COOPERATIVE, INC., A NEBRASKA COOPERATIVE CORPORATION, ET AL., APPELLEES.

332 N.W.2d 690

Filed April 21, 1983.   No. 81-887.

Paul L. Douglas, Attorney General, and Dale A. Comer, for appellant.

Jim Zimmerman of Atkins, Ferguson, Zimmerman, Carney & Law, for appellees Wilson, Thomas, and Associated Grocers.

Paul F. Hofmeister of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellees Alexander Supermarket and Zemanek.

Lynn D. Hutton, Jr., P.C., for appellees Gillette Dairy and Simmon.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, HASTINGS, and CAPORALE, JJ., and BRODKEY, J., Retired.

McCOWN, J.

This is an antitrust proceeding by the State of Ne-

braska against the defendants under the Nebraska Consumer Protection Act, alleging conspiracy in illegal restraint of trade. The State sought injunctive relief, penalties, and damages. The District Court entered summary judgment in favor of defendants, dismissed plaintiff's petition, and awarded attorney fees and expenses to defendants. The State has appealed.

The petition alleges a conspiracy and actions in restraint of trade and commerce with reference to the marketing of milk and dairy products in Scotts Bluff County, Nebraska, primarily in the cities of Scottsbluff, Mitchell, and Gering.

The defendant Associated Grocers of Nebraska Cooperative, Inc. (Associated), is engaged in the business of wholesale sales of grocery products, including milk and dairy products, to Nebraska retail grocers. The individual defendant Jess W. Wilson is the manager of dairy sales for Associated. The individual defendant James W. Thomas is general manager for Associated.

The defendant Gillette Dairy West, Inc. (Gillette), is a Nebraska corporation engaged in the operation of dairy facilities and wholesale sale of milk and dairy products to Nebraska retail grocers. The individual defendant Robert L. Simmon is the general manager for Gillette.

The defendant Alexander Supermarkets, Ltd. (Alexander), is a Nebraska corporation engaged in the business of retail sales of grocery items and dairy products, with stores located in Scottsbluff and Mitchell, Nebraska.

The individual defendant Glen Zemanek is the owner and operator of Alexander. Associated is a wholesale supplier of milk and dairy products to Alexander and Zemanek at the Scottsbluff store, and Gillette is a supplier of dairy products to Alexander and Zemanek at both the Scottsbluff and Mitchell stores.

The record consists of the pleadings, interroga-

tories, depositions, and affidavits submitted and considered by the court on the motions for summary judgment.

In the latter part of 1980 Donald Reichert was the operator of Buy Rite Super, Inc., a retail grocery business in Mitchell, Nebraska. In addition to grocery products purchased from Associated, Reichert sold two brands of milk in his store. One was Gillette milk, which Reichert purchased from Ewing Distributing, and the other was Meadow Gold milk. Reichert sold one gallon of Meadow Gold 1 percent milk for $1.79. That price was considerably lower than other retail milk prices in the area and was used to draw customers to Reichert's store.

According to Reichert's testimony each of the individual defendants contacted him during the month of November 1980 in regard to his price for 1 percent milk. On November 18, 1980, defendant Wilson telephoned Reichert and requested him to raise his retail price for Meadow Gold 1 percent milk to $2.19 per gallon in order to get that price in line with other retail grocers in the area. Wilson denies telling Reichert that his prices were too low and testified that his suggestions were only to help Reichert with his cash flow.

On November 19, 1980, the defendant Zemanek, the owner-operator of Alexander, visited Reichert's store. Reichert's version is that Zemanek told Reichert he must raise his retail milk prices or Zemanek would reduce his prices to force Reichert out of business. Zemanek denies making any such statement, although he admits he was in Reichert's store for a price check at that time.

On the same day, defendant Thomas, general manager of Associated, visited Reichert's store. Reichert's testimony was that Thomas asked him to raise his retail milk prices because Thomas was afraid that Zemanek would start a milk price war that would jeopardize Associated's milk program. Thomas denies making any such statement.

On November 19, 1980, the defendant Simmon of Gillette came to Reichert's store and gave Reichert a retail milk price list. Reichert's testimony was that Simmon indicated to Reichert that the price list represented the retail milk prices which Simmon and Zemanek wished Reichert to adopt at his store. Simmon denies telling Reichert that he should move his milk prices up.

Simmon also visited the store a second time in 1980, although the exact date is in dispute. Reichert states that Simmon told him that Simmon had talked to Zemanek and that if Reichert was willing to raise his retail prices, Zemanek would lead and Reichert could follow. Simmon testified that he told Reichert: "I'm surprised you weren't up because I know Glen [Zemanek] would be if you were."

The defendant Thomas also visited the Reichert store again on November 21, 1980. According to Reichert's version of the conversation, Thomas told Reichert that if a milk price war came about as a result of Reichert's low retail milk price, Reichert could be expelled from Associated. Thomas stated that he told Reichert that he could not be expelled for his pricing decisions but that he could be cut off if he did not pay for his groceries.

During the relevant time period here both Simmon and Wilson routinely monitored milk prices in the Scottsbluff area. When one retailer, usually the local Safeway store, changed its milk prices, Simmon and Wilson would prepare a retail price list showing that new price. These price lists were then disseminated to area grocery stores.

During the relevant time frame Zemanek requested Simmon to check Reichert's milk prices to determine if they were low. Following the visits of both men to Reichert's store, Zemanek discussed the situation with Simmon and the president of Gillette. Gillette offered Zemanek a generic milk in cardboard containers at the wholesale price of $1.47 per gallon. For 1 week Zemanek sold this milk for $1.49

per gallon. Zemanek then raised his price to $1.79 per gallon.

In late November 1980 Reichert filed a complaint with the antitrust division of the Nebraska Department of Justice. The department investigated Reichert's complaint, interviewed individuals, and took affidavits. On the basis of the investigation the State of Nebraska filed its petition in this action on December 29, 1980, alleging that the various defendants had entered into a conspiracy in restraint of trade and had attempted to monopolize and conspired to monopolize trade, and that the citizens of Nebraska were injured by the violations alleged.

Motions for summary judgment were filed on behalf of the defendants, and on the basis of the pleadings, depositions, affidavits, and interrogatories, and after submission of briefs and arguments of counsel, the District Court entered summary judgment in favor of each of the defendants and dismissed the plaintiff's petition. The court later awarded attorney fees and expenses to the defendants as prevailing parties pursuant to Neb. Rev. Stat. § 59-1608 (Reissue 1978). The State has appealed.

The defendants contend that even if the State's version of the facts be accepted as true, the evidence is insufficient to raise a jury issue on a charge of conspiracy in restraint of trade. The argument is that there is no direct evidence of any conspiracy or agreement to conspire, and that the defendants are entitled to judgment as a matter of law. We disagree.

The State brought action under the state version of the Sherman Antitrust Act. That act is designated as the Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 et seq. (Reissue 1978). Section 59-1603 provides: "Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful."

A conspiracy need not be established by direct evi-

dence of the acts charged, but may, and generally must, be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purposes to be accomplished. *Hompes v. Goodrich Co.,* 137 Neb. 84, 288 N.W. 367 (1939). See, also, *Adams Dairy Company v. St. Louis Dairy Company,* 260 F.2d 46 (8th Cir. 1958); *Admiral Theatre Corp. v. Douglas Theatre Co.,* 437 F. Supp. 1268 (D. Neb. 1977), *modified* 585 F.2d 877 (1978).

The party alleging a conspiracy in restraint of trade does not have to show any overt act other than the act of conspiracy. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S. Ct. 811, 84 L. Ed. 1129 (1940), *reh'g denied* 310 U.S. 658, 60 S. Ct. 1091, 84 L. Ed. 1421.

Both horizontal price-fixing among wholesalers and vertical price-fixing between wholesalers and retailers are presumed to be in restraint of trade and are per se violations of the antitrust laws. *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S. Ct. 1925, 64 L. Ed. 2d 580 (1980).

In the case at bar on the record set out previously, it is obvious that the parties disagreed on nearly every material factual issue in the case. The contents of conversations, the occurrences or nonoccurrences of certain events, and the intent with which individuals took the various actions which they did are all in serious dispute. In addition, the benefit of all favorable inferences which may reasonably be drawn from the evidence must be given to the State.

The case of *Bank of Valley v. Shunk,* 208 Neb. 200, 302 N.W.2d 711 (1981), is controlling here. In that case we held that the moving party is not entitled to summary judgment except where there exists no genuine issue as to any material fact and where, under the facts, he is entitled to judgment as a matter of law.

Summary judgment is an extreme remedy and should be awarded only when the issue is clear beyond all doubt. Any reasonable doubt touching

the existence of a material issue of fact must be resolved against the moving party.

Upon a motion for summary judgment the court examines the evidence not to decide any issue of fact but to discover if any real issue of fact exists. In this respect the court should take that view of the evidence most favorable to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences which may reasonably be drawn from the evidence.

The judgment of the District Court in granting the motions for summary judgment was erroneous. The judgment of the District Court is reversed and the cause is remanded for further proceedings.

REVERSED AND REMANDED FOR<br/>FURTHER PROCEEDINGS.

WHITE, J., participating on briefs.